ABRAHAM ZIMMERMAN and MARILYN ZIMMERMAN, petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zimmerman v. Commissioner
Docket No. 4661-85.
United States Tax Court
T.C. Memo 1987-534; 1987 Tax Ct. Memo LEXIS 526; 54 T.C.M. (CCH) 927; T.C.M. (RIA) 87534; October 20, 1987. *526 On their returns for 1979 and 1981, Ps claimed deductions for alleged invesments in coal mining properties Held:
(1) Ps are not entitled to the deductions claimed for 1979 because they failed to establish that commercially marketable quantities of coal had been disclosed at the time of the alleged expenditures within the meaning of sec. 616(a), I.R.C. 1954. Ps also failed to prove that they actually made an investment in the coal mining property. (2) Ps are not entitled to the deductions claimed for 1981 because they failed to prove that the alleged mining activity was carried on with an objective for economic profit. (3) Additional interest is payable under sec. 6621(c) I.R.C. 1954, because there was a substantial underpayment of tax attributable to a tax motivated transaction. (4) Ps are liable for damages under sec. 6673, I.R.C. 1954, for instituting a proceeding primarily for delay or taking a position which was frivolous or groundless. William Randolph Klein, for the petitioners Avery B. Cousins, III and Steven A. Wilson, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Year
Deficiencey
1979
$  3,482.34
1980
33,143.46
1981
98,406.34
The issues for decision *529 are: (1) Whether the petitioners are entitled for 1979 to a deduction under section 616 of the Internal Revenue Code of 1954[1] for the alleged development expenditures incurred with respect to the Virginia Mining Development Program; (2) whether the coal mining activities allegedly carried on in 1981 by West Virginia Peerless and Satin Sewell No. 2 partnerships were carried on with the objective of making a profit within a meaning of section 183; (3) whether for 1981 there was a substantial underpayment of tax by the petitioners attributable to a tax motivated transaction within the meaning of section 6621(c); and (4) whether damages should be awarded to the United States under secion 6673 because the petitioners instituted proceedings primarily for delay or took a position which was frivolous or groundless. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are found. The petitioners, Abraham Zimmerman and Marilyn Zimmerman, husband and wife, maintained their legal residence in Daytona Beach, Florida, at the time the *530 petition in this case was filed. They filed their joint Federal income tax returns for 1979, 1980, and 1981 with the Internal Revenue Service Center in Chamblee, Georgia. Mr. Zimmerman will sometimes be referred to as the petitioner. Mr. Zimmerman came to the United States in 1947. He worked as a dishwasher, bus boy, and a waiter, until he saved enough money to purchase a chicken farm. He was a chicken farmer until 1965, when he sold the farm and became involved in the business of arranging for the financing of real estate developments. In time, he also became involved in the financing of the purchase of coal mining equipment. Later, he sold coal as a broker to public utilities. In the course of that activity, he met Bill Humphreys, who came to him to borrow money for the acquisition of coal mining equipment. That association led to the alleged investments in coal mining activities which are the subject of this case. The issues in this case arise out of the petitioner's participation in the following coal mining programs: (1) The Virginia Mining Development Program (VMD program); and (2) the West Virginia Peerless Mining Associates program (WVP program) and the Satin Sewell *531 No. 2 Mining Associates program (SS No. 2 program). Other than his experience as a broker and his experience in organizing tax shelters, Mr. Zimmerman had no experience in the coal business. For the purpose of the findings of fact and opinion in this case, each program will be discussed separately. Virginia Mining Development Program
In connection with the VMD program, a Private Offering Memorandum (POM), dated October 23, 1978, was prepared. The POM contained a number of attachments which explained various aspects of the VMD program. These attachments included the following: (1) Joint Operating Agreement; (2) Sublease Agreement; (3) Engineering Report; (4) Tax Opinion; [2] (5) Mining Services Agreement; (6) Mining Development Agreement; (7) Sales Agreement; and (8) Projections. The VMD program was set up by AMCOAL Energy Corporation (AMCOAL) in 1978. AMCOAL was the operating manager for the program. In 1978, the petitioner was vice president, and Martha Epstein was secretary/treasurer for AMCOAL. The petitioner eventually became president of AMCOAL. Ms. Epstein had not training *532 or experience in the business of coal mining. As operating manager, AMCOAL was to submit annual reports to participants, maintain accounting records, and perform other administrative services on behalf of the participants in return for a fee. The contract miner for the VMD program was Dabco Fuel, Inc. (Dabco). Bill Humprheys was Dabco's president and director. A related entity, Pardee Coal Company, Inc. (Pardee), was designated as sales agent for the program. The VMD program program offered 35 "working interests" for an initial cash contribution of $ 25,000 and the execution of a non-negotiable, nonrecourse promissory note in the amount of $ 54,366 for each working interest. The program also offered a one-half working interest to AMCOAL for $ 500 cash and a note. The original property to be mined was in Wise County, Virginia, approximately 7 miles north of Appalachia in the Mud Lick section on Black Mountain (the Mud Lick property). The property was leased by Blackwood Fuel Company (Blackwood) to Greater Pardee, Inc. (Greater Pardee), which in turn subleased the property to the participants in the VMD program. [3]
*533 In the sublease agreement, Greater Pardee and Blackwood warranted that there 1,500,000 tons of mineable and merchantable deep coal reserves on or beneath the Mud Lick property. Greater Pardee, as sublessor, further agreed to provide additional coal-bearing property in the event the existing reserves proved inadequate. However, the force majeure clause contained in the sublease agreement states as follows: 11. FORCE MAJEURE: The failure of either party to perform its obligations under this Agreement for reasons beyond their respective controls after using every reasonable effort to cure and remedy any problems or consequence thereof as the result of Acts of God, acts of the public enemy, insurrection, riots, strikes, labor disputes, lock-outs, slow-downs, fires, explosions, floods, shortage of railroad cars, inability to obtain permits for reasons beyond the control of the SUBLESSEES (e.g. a state policy of non-issuance), interruptions of transportation, embargoes, orders or acts of military or civil authority or adverse weather conditions that render hazardous the performance of the operations contemplated hereby or unavailability of equipment or replacement parts shall not constitute *534 a breach of this Agreement or a violation of its terms and conditions. Also included shall be the unavailability of commercial merchantable and mineable coal on the Property pursuant to the representations of the SUBLESSOR herein and the inability to obtain state and federal mining permits. [Emphasis added.]
The mining development agreement and the mining services agreement contained similar paragraphs, but they did not include the last sentence dealing with the unavailability of commercially merchantable and mineable coal. The mining services agreement contained a minimum mining commitment paragraph. Under this provision, the contract miner, Dabco, warranted to mine and make available for delivery no less than 120,000 tons of merchantable coal in each year of the program. The provision also provided for liquidated damages in the even the contract miner was unable to meet the minimum delivery commitment. These liquidated damages were in an amount equal to $ 2.40 multiplied by the difference between the 120,000 tons and the actual tons delivered in such calendar year. Under the mining development agreement, Dabco, as contract miner, agreed to charge the participants *535 $ 2,550,000.00 in cash and notes for the development of the coal reserves and to construct and maintain facilities necessary to extract coal at a rate of 120,000 tons per year. Dabco was to receive $ 620,000 in cash and an aggregate of $ 1,930,000.00 in notes. In the mining services agreement, Dabco agreed to provide services during the production stage of the VMD program at a base price of $ 17.60 per ton for coal mined and removed from the property plus an amount equal to 70 percent of the net sales proceeds of coal in excess of $ 27.00 per ton. The POM also contained coal reserve estimates that were prepared in September 1978 for Blackwood by Perma Resources Corporation (Perma). According to is report, Perma is an engineering and geological study company from Colorado Springs, Colorado. The Perma report determined that there were between 1,500,000 and 1,636,762 tons of "proven" coal in place. Perma also determined that there would be a "Total Development Cost" of $ 2,242,500 for the project. No evidence was submitted concerning the competency or qualifications of the Perma mining engineers, who purportedly prepared the report; nor was there any evidence concerning the resources *536 and information Perma used in preparing such report. Another engineering evaluation of the Mud Lick property was performed by Arthur D. Thompson of Minerals Associates Inc. (MA). Mr. Thompson visited the site and spent a day evaluating the property. The stated purpose of the report was to evaluate the mine installations, mining operations, and management. The MA report gives estimations on how many days per week the mine must be operated in order to maintain the 10,000 tons per-month quota. The four-page MA report also makes recommendations at its conclusion on how to improve the operation's production. The report contained only conclusions, with explanations. The POM also contained financial projections that may have been prepared by Burton Lipkin, an experienced certified public accountant without any experience in the mining industry. In making his projections, Mr. Lipkin assumed that the mine would produce 120,000 tons of coal per year and that the coal would be sold for $ 27 a ton. He projected that an investor would have a loss of $ 75,597 for the first year and income of from $ 4,377 to $ 7,205 per year for the remaining years of the program, or total income of $ 68,948 *537 for the 12 years of the program. The notes to be executed by the participants were wholly without recourse to the participants. The sole collateral was the participant's working interest in the sublease. The notes were due approximately 12 years from the closing date of the POM and provided for interest at a rate of 6 percent per annum. The principal (and interest) on the notes were payable commencing January 1, 1979, and on each successive monthly date thereafter at a monthly rate of 377.54 per interest. If any payment of principal or interest was in default for 2 years, the contract miner, after 3 months' notice, could declare the entire unpaid balance of such note (plus interest) due and payable. The participants in the VMD program contributed cash in the amount of $ 875,000 and executed nonrecourse notes in the amount of $ 1,930,000, but there is no evidence that any of the participants was ever called upon to make any payment on the notes. Approximately 18,000 tons of coal were mined from the Mud Lick property in 1978, but it has not been established how much of, or when, such coal was sold. In 1979, 85,277.85 tons of coal were mined and sold, and 29,430.74 tons were *538 mined and sold in 1980. The total coal sales under the VMD program were $ 3,373,942.04 in 1979 and $ 792,929.24 in 1980. After September 1980, Dabco ceased operations at the Mud Lick property. On their Federal income tax return for 1979, the petitioners claimed a deduction for a loss of $ 19,294.83 attributable to a small business corporation, Ammcre, Inc. (Ammcre). Mr. Zimmerman owned 50 percent of the stock of Ammcre, and Ms. Epstein owned the other 50 percent of such stock. There is no proof that Mr. and Mrs. Zimmerman, Amcoal, or Ammcre ever furnished any cash or executed any notes under the VMD program, and the record contains no explanation of the alleged role of Ammcre in the VMD program. In this notice of deficiency issued to the petitioners, the Commissioner determined that the loss attributed to Ammcre was not allowable. The Commissioner determined that it had not been established that the expenses claimed by the participants in the VMD program had in fact been incurred or that such expenses were deductible. Satin Sewell No. 2 Mining Associates and West Virginia Peerless Mining Associates
The petitioner and other participants in the SS No. 2 program received *539 a Confidential Memorandum (CM), which described the program being offered. A number of documents were attached to the CM. Subsequently, the participants received to supplements to the CM which added to or corrected the original CM. The CM for the SS No. 2 program provided that investors were to be offered 35 of a total of 36 limited partnership interests. Each interest was available at a price of $ 15,000 in cash plus the delivery of a promissory note for $ 34,500. The CM also provided that one interest (the 36th) was to be sold to AMCOAL, the general partner, for $ 1,000 cash and the delivery of a promissory note for $ 34,500, and that such note would have identical terms and provisions as the notes delivered by the limited partners. The petitioners allege that they purchased one-half of 1 interest in the SS No. 2 program by payment of $ 7,500 cash and by executing and delivering a promissory note for $ 17,250. The SS No. 2 program was promoted by AMCOAL and Mr. Zimmerman and Ms. Epstein in 1981. Under the SS No. 2 program, a limited partnership was to be organized. AMCOAL was the general partner of the partnership, and Ammcre was the financial consultant. The SS No. 2 *540 partnership executed a sublease agreement, a mining development agreement, a mining services agreement, and a sales agency agreement whereby Southern Eagle Mining Corporation (Southern Eagle) was to be the sublessor, contract miner, and sales agent under the program. Southern Eagle, as sublessor, and the SS No. 2 partnership, as sublessee, executed a sublease agreement on December 30, 1981, with respect to the Wilson property in Randolph County, West Virginia. At this time, Southern Eagle possessed only an option to lease the Wilson property from Lewis Wilson. Southern Eagle never exercised such option and never mined any coal from such property. Consequently, the SS No. 2 partnership did not receive any legal rights in the Wilson property pursuant to the sublease agreement entered into with Southern Eagle. In the mining development agreement, Southern Eagle, as contract miner for the SS No. 2 partnership, agreed to develop the Wilson property. Pursuant to the minimum mining commitment contained in the mining services agreement, Southern Eagle agreed to mine and make available for delivery no less than 83,333 tons of merchantable coal by the end of 1982 and in each year thereafter *541 during the term of the mining services agreement. Southern Eagle was to receive $ 362,250 in cash and $ 1,242,000 in promissory notes from the SS No. 2 partnership to develop the Wilson property. The SS No. 2 partnership agreed to pay Southern Eagle $ 29.46 per ton for coal mined by it on the Wilson property, plus 50 percent of the net sales proceeds of coal sold in excess of $ 40 per ton. Contained in the sublease agreement was a provision regarding the substitution or addition of property. This provision stated that in the event that Southern Eagle's interest in the Wilson property granted herein is defective or any portion of the property is being used or exploited by another person having the right to do so, and such defect cannot be cured within 60 days following written notification thereof by Southern Eagle, then substitute property shall be provided. Also, Southern Eagle warranted that to the extent there were not commercially mineable and merchantable coal reserves on the property of at lease 1,000,000 tons, it would within 90 days after notification of such deficiency, contribute additional coal-bearing land to compensate for such deficiency. Southern Eagle never *542 received any written notification from the SS No. 2 partnership or from AMCOAL to the effect that Southern Eagles' interest or lessee of the Wilson property was defective, or that any portion of the Wilson property was being used or exploited by any other person having a right to so use or exploit that property. Also, Southern Eagle never received any written notification, or any other proof, from the SS No. 2 partnership or from AMCOAL regarding the amount of coal reserves on the Wilson property. Southern Eagle never provided any written notification to AMCOAL, the petitioners, or any of the participants in the program regarding the substitution of a property for the Wilson property. The only property on which Southern Eagle mined any coal during 1981 through the present is known as Bowden Mine #1. Southern Eagle never executed a written sublease or assignment of the Bowden Mine #1 property to the SS No. 2 partnership. AMCOAL, as general partner for the SS No. 2 partnership, never notified participants that the Bowden Mine #1 property was being mined instead of the Wilson property. In fact, the petitioner did not even know until the trial of this case that the coal that Southern *543 Eagle was allegedly allocating to this program was actually being mined on property other than the Wilson property, and had never even heard of the Bowden Mine #1. The mining development agreement under the SS No. 2 program provided that the notes executed by the program's participants would be amortized at the rate of $ 2.14 per ton of coal sold. If Southern Eagle had mined 83,333 tons of merchantable coal per year, as required pursuant to the minimum mining commitment, a total of $ 178,332.62 would be applied from coal sales each year to satisfy the notes. The notes executed by the participants under the SS No. 2 program provided that principal and interest shall be paid in equal annual installments of $ 5,220.00 per interest. Since there were 36 interests in the program, the total note payments due each year was $ 187,920.00. Each note stated that it was a "promissory note (with recourse)" and that the "maker is personally liable." The minimum mining commitment for the SS No. 2 program provided that if Southern Eagle failed to deliver 83,333 tons of coal in any calendar year, Southern Eagle shall pay liquidated damages in an amount equal to $ 2.63 multiplied by the difference *544 between 83,333 tons and the amount actually delivered in such calendar year. The difference between the amount received from coal sale proceeds and the amount due on the notes ($ 9,587.38) would result in each holder of an interest in the SS No. 2 program annually owning Southern Eagle $ 266.32 on the notes. Therefore, pursuant to the mining development agreement and the minimum mining commitment, Southern Eagle agreed to ensure, or guarantee, that substantially all required note payments due from SS No. 2 program participants would be made from either coal sale proceeds or through application of the liquidated damages provision. Southern Eagle has never made any payments to AMCOAL or to the SS No. 2 partnership pursuant to the liquidated damages provision in the minimum mining commitment. Also, the petitioner in his individual capacity as a participant in the SS No. 2 program has never made a payment under any promissory note that he alledgedly executed under this program. The petitioner and other participants in the WVP program received a confidential memorandum which described the program being offered. This CM provided that 35 of 36 partnership interests were to be offered *545 for $ 25,000 cash plus the delivery of a promissory note in the amount of $ 57,500 for each interest. The CM for the WVP program further provided that one interest was to be sold to AMCOAL for $ 1,000 cash and the delivery of a promissory note in the amount of $ 57,500. Under the WVP program, a limited partnership was to be formed. The WVP program was promoted by AMCOAL and Mr. Zimmerman and Ms. Epstein. AMCOAL was the general partner for the WVP partnership, and Ammcre was the financial consultant. The WVP partnership entered into a sublease agreement, a mining development agreement, a mining services agreement, and a sales agency agreement whereby Southern Eagle was to be the sublessor, contract miner, and sales agent for the program. On December 30, 1981, Southern Eagle, as sublessor, and the WVP partnership, as sublessee, entered into a sublease agreement. Under such agreement, the WVP partnership was to acquire a leasehold interest in the Hedrick property in Randolph County, West Virginia. At this time, Southern Eagle had only an option to lease the Hedrick property from Mary Keim Hedrick. In fact, Southern Eagle has never exercised such option. Consequently, the WVP *546 partnership did not receive any legal rights in the Hedrick property pursuant to the sublease agreement entered into with Southern Eagle. Southern Eagle, pursuant to the mining development agreement, was to receive $ 598,000.00 in cash and $ 2,070,000.00 in notes under the WVP program to develop the Hedrick property. Pursuant to the mining services agreement, Southern Eagle agreed to mine 1,440,000 tons of coal from the Hedrick property, 120,000 tons per year for 12 years. The WVP partnership agreed to pay Southern Eagle $ 27.91 per ton for coal mined by it on the Hedrick property, plus 50 percent of the net sales proceeds of coal sold in excess of $ 40.00 per ton. In the sublease agreement, Southern Eagle warranted that it was the owner of the coal rights which were the subject of the lease, that it had the good and lawful right to sublease the coal property, and that upon recording the lease, the sublessee shall have the exclusive right to mine and remove the coal. Southern Eagle also agreed that in the event its interest was defective it would furnish substitute property upon demand therefor and warranted that "to the extent there is not commercially mineable and merchantable *547 coal reserves on the Property of at least 1,500,000 tons of recoverable coal reserves," it will contribute additional property. The sublease was never recorded, and no coal was ever mined from the Hedrick property. However, Southern Eagle never received any written notification from the WVP partnership or from AMCOAL to the effect that Southern Eagle's interest as lessee in the Hedrick property was defective. Also, Southern Eagle never received any written notification or any other proof from the WVP partnership or from AMCOAL regarding the amount of coal reserves on the Hedrick property. AMCOAL never notified any of the participants that the Bowen Mine #1 was being used under the program rather than the Hedrick property. Southern Eagle never provided any written notification to AMCOAL, the petitioners, or any of the participants in the WVP program regarding the substitution of any property for the Hedrick property. Nor did Southern Eagle ever execute a written assignment of the Bowden Mine #1 property to the WVP partnership. Johnson & Anderson, Inc. (J & A), performed and prepared a Reserve Analysis and Feasibility Study pertaining to the Hedrick property. The report was *548 in supplement No. 1 to the WVP program's CM and contained information concerning the location, acreage, and topography of the land, estimated coal reserves, coal quality, and estimated development cost. The report, without explanation, stated that coal mined from the Hedrick property "should range from $ 35.00 to $ 39.00 per ton F.O.B. mine." Also, there is no discussion concerning the marketability of the coal or current price of coal of similar quality. One page of the J & A report is devoted to coal reserves and a mining plan. The report estimated coal reserves on the Hedrick property based on available data in the amount of 1,210,000 tons (460,000 tons recoverable from strip mining and 750,000 tons recoverable by deep mining). The following is the mining plan set forth in the report: Mining Plan
The first phase of the mining operation is to prospect the areas where the Sewell Seam outcrops and to obtain core borings along the ridge in the vicinity of the west boundary line. This will enable the determination of the economic limits of the mineable coal seams that exist on the property. The second phase will consist of upgrading the existing access road to the property *549 and constructing a haul road to the site of the mining operation. The third phase will consist of strip mining the minable seams. The fourth phase will consist of deep mining the Sewell Seam. The mining development agreement entered into by the WVP partnership provided that the notes executed by the program's participants would be amortized at the rate of $ 2.61 per ton of coal sold. If Southern Eagle had mined the Hedrick property in accordance with the minimum mining commitment, so that 120,000 tons of coal were mined per year, a total of $ 313,200 would be applied annually from coal sale proceeds to the satisfaction of the notes. The notes executed in regard to the WVP program provided that principal and interest on the notes shall be paid in equal annual installments of $ 8,700 per interest. In that there were 36 interests in the WVP program, the total note payment due in each year would be $ 313,200. Each note stated that it was a "promissory note (with recourse)" and that the "maker is personally liable." The minimum mining commitment provided that in the event that Southern Eagle failed to deliver at least 120,000 tons of merchantable coal in any year, it would pay *550 liquidated damages in an amount equal to $ 3.10 multiplied by the difference between 120,000 tons and the tons of coal actually delivered by Southern Eagle. Since the annual note payments equal to the amount to be applied from coal sale proceeds, it is clear that the promissory notes executed by the program's participants were to be satisfied from sales proceeds. In the event less than 120,000 tons of coal were mined in a year, the notes were to be satisfied through application of the liquidated damages clause. Southern Eagle has never made any payments to AMCOAL or the WVP partnership pursuant to the liquidated damages clause in the minimum mining commitment. The CM of both the SS No. 2 program and the WVP program contained financial projections that were prepared by Burton Lipkin. In making his projections for the SS No. 2 program, he assumed the mine would produce 83,333 tons of coal per year and that the coal would be sold for $ 40 per ton. In making his projections for the WVP program, he assumed the mine would produce 120,000 tons of coal per year and that the coal would be sold for $ 40 per ton. He also projected that each participant would realize income of $ 41,664 in *551 the SS No. 2 program and $ 108,000 in the WVP program for the remaining years of each program. Contained in the CM of both the SS No. 2 program and the WVP program was a projected tax benefits section. These tax benefit sections indicated a taxable benefits section. These tax benefit sections indicated a taxable loss in 1981 principally as a result of the payment of mining development costs as follows: Stain Sewll
West Virginia
No. 2
Peerless
Projected loss per interest
$ 44,562.50
$ 74,929.00
Cash investment per interest
15,000.00
25,000.00
Ratio of project write-off (appox.)
3:1
3:1
Both CMs contained a summary of tax benefits, as well as a lengthy tax opinion. Southern Eagle mined and allocated to the SS No. 2 and the WVP partnerships the following amounts of coal from the Bowden Mine #1: 3,500 tons in 1981; 61,993 tons in 1982; 110,053 tons in 1983; and 54,896 tons in 1984. The total amount of coal mined by Southern Eagle from the Bowden Mine #1 from 1981 through 1984 was 230,442 tons. Pursuant to both programs, Southern Eagle agreed to mine 83,333 tons per year for 12 years for the SS No. 2 program and 120,000 tons per year *552 for 12 years for the WVP program. The total amount of coal that Southern Eagle agreed to provide over the life of both programs was 2,439,996 tons. In fact, Southern Eagle's 4-year operation resulted in less than 10 percent of its commitment of both programs being realized. There was very little correspondence from AMCOAL and the petitioner to the participants of either program. The participants in the SS No. 2 program received a letter from AMCOAL regarding the program's operations dated July 7, 1982. This letter forwarded checks ranging in amount from $ 81.08 to $ 291.66, which allegedly resulted from the contract miners' sale of coal in the month of May 1982. The letter did not mention the amount of coal mined by Southern Eagle, the price received for the coal, or the property from which the coal was mined. The participants in the WVP program also received a letter from AMCOAL dated July 7, 1982. This letter also contained checks which allegedly resulted from Southern Eagle's sale of coal. The letter contained no information about the amount of coal, the price of coal, or the location from where the coal was mined. On its 1981 partnership return, the SS No. 2 partnership *553 claimed deductions for mine development costs of $ 1,604,250 and administrative expenses of $ 10,000. On its 1981 partnership return, WVP partnership claimed deductions for mine development costs of $ 267,000 and administrative costs of $ 10,000. On their 1981 Federal income tax return for 1981, the petitioners claimed a deduction of $ 22,420 for their distributive share of the loss reported by the SS No. 2 partnership and a deduction of $ 186,000 as their distributive share of the loss reported by the WVP partnership. In his notice of deficiency issued to the petitioners, the Commissioner disallowed the deductions claimed by the petitioners on the grounds that it has not been established that the partnerships were engaged in a trade or business. OPINION The deficiencies determined by the Commissioner in this case arise out of the petitioner's purported participation in the following coal mining programs: (1) The "1979 Programs" consisting of the Viriginia Mining Development and Southwest Virginia Mining Development programs; (2) the "1980 Programs" consisting of the Buckeye Branch, Oakdale, and Kentucky River Mining Programs; and (3) the "1981 Programs" consisting of Satin Sewell *554 Mining, West Virginia Peerless, and Satin Sewell No. 2 programs. For the purpose of the trial of this case, the parties agreed that the issues concerning the "1980 Programs" should be severed for disposition at a later time. The parties further agreed that the evidence presented with respect to the Virginia Mining Development Program will be controlling for purposes of other participants in that program and for participants in the Southwest Virigina Mining Development program. Similarly, the evidence presented with respect to the Satin Sewell No. 2 Mining Associates and West Virginia Peerless Mining Associates will be controlling for the participants in the Satin Sewell Mining Program. Virginia Mining Development Program
The Commissioner advances a number of arguments to support his disallowance of the deductions claimed by the participants with respect to the VMD program. At the outset, he argues that the petitioners are not entitled to such deductions because they failed to prove that they made any investment in such program. Although the POM provides that AMCOAL was to acquire a one-half interest in the program, there is no evidence showing that either the petitioners, *555 AMCOAL, or Ammcre ever furnished any cash to acquire any interest under the program or ever executed any notes described in the program. Accordingly, on this record, we must conclude that Ammcre, and thus the petitioners, are not entitled to deduct any losses allegedly incurred by the participants in the VMD program. Walter v. Commissioner,753 F.2d 35 (6th Cir. 1985), affg. Ayres v. Commissioner,T.C. Memo. 1983-202. That holding is dispositive of the petitioners' claim in this case, but since this is a test case, we will consider another of the arguments presented by the Commissioner. In the alternative, he maintains that the alleged expenditures by Dabco on behalf of the participants in the VMD program do not constitute deductible development expenditures under section 616(a). Section 616(a) provides, in part, that there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit, if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. Development expenses under section *556 616 are those which are made after such time when, in consideration of all the facts and circumstances (including actions of the taxpayer), deposits of ore or other minerals are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer. Sec. 1.616-1(a), Income Tax Regs. Also, under section 616(a), a taxpayer is allowed a deduction for development expenditures whether or not such expenditures are made in development or production stage of the mine or other natural deposit. Sec. 1.616-1(a), Income Tax Regs.
The burden of providing that the expenditures were for the development of the Mud Lick mine and were incurred after commercially marketable quantities of coal had been discovered is on the petitioners. Conforte v. Commissioner,692 F.2d 587 (9th Cir. 1982), affg. on this issue 74 T.C. 1160 (1980); Santa Fe Pacific Railroad Co. v. United States,378 F.2d 72, 75 (7th Cir. 1967). In order to be entitled to deduct mine development expenditures, two requirements must be met: (1) The expenditure must have been paid or incurred after the existence of ore or minerals in commercially *557 marketable quantities has been disclosed; and (2) the expenditures must be for the development of the mineral deposit. Whether a development expense was paid or incurred after disclosure of the existence of ore or other mineral in sufficient quantity and quality to reasonably justify commercial exploitation depends on the fact and circumstances of the particular case. Sec. 1.616-1(a), Income Tax. Regs.
In determining whether marketable quantities of coal were disclosed prior to the expenditure for development of the mine, we must determine the sufficiency of the exploration program. Thomas v. Commissioner,84 T.C. 1244, (1985), affd. 792 F.2d 1256 (4th Cir. 1986). The economic and commercial viability of an operation is dependent upon the quantity, quality, accessibility, and marketability of the coal. The result of an exploration program must be viewed in light of a financial and market analysis that establishes the existence of a commercial deposit. Thomas v. Commissioner,84 T.C. at 1276. This court in Capek v. Commissioner,86 T.C. 14, 30, 31 (1986), set out a multi-phase exploration program which is essential *558 to determine if coal can be mined at a profit from a selected block of land. Progressive evaluations are made between each phase to provide greater degrees of certainty that the coal is present in sufficient quantities to warrant expenditure of additional funds. The first phase of the exploration program is a preliminary investigation which is made to determine if potential coal reserves are located on the property. The next phase is the feasibility analysis which includes an analysis of market needs and location, transportation availability and cost, and product quality and quantity versus consumer specifications and demands. If the feasibility analysis is favorable, a detailed mine design and reclamation plan is developed as the final step. The POM, circulated pursuant to the VMD program, contained a report prepared by Perma, which is titled "Coal Reserve Study, Mud Lick Area -- Morris Seam." The report stated that there are approximately 1.5 million tons of reserves in the subject area. The report also provided an estimate of the development cost required to bring the Mud Lick property into production. However, the competency and qualifications of the individuals who prepared *559 the Perma report have not been established. In addition, the coal reserve analysis, contained in the Perma report, sorely lacked sufficient substance to support the proposition that there were commercially marketable quantities of coal present on the VMD property. Internal Revenue Service Engineer Earl Hoover prepared a report relating to the VMD program, and he was called as an expert witness. In his report, he pointed out several problems with the Perma report. The Perma report stated that "seam thickness data points were established by inspection and examination of existing documents," without explaining which documents were being referred to. The Perma report never explained whether previous underground working maps or previous mine company's production records were studied. There was no mention of selective drilling to determine coal height and quality, nor was there any indication that Perma engineers actually visited the mine site to view or sample the seam. The Perma report contained no discussion of the potential environmental permitting problems, reclamation, or economic feasibility of operating the mine. Mr. Hoover's report contained a description of the steps in *560 planning and developing a coal mine, a reserve analysis, and a list of the estimated development costs, as well as the evaluation of the Perma report. Mr. Hoover described in some detail the many steps in planning and developing coal mine. Mr. Hoover concluded, and we agree, that both the geological portion and the itemization of mine development costs contained in the Perma report lacked sufficient substance to support the proposition that there were commercially marketable quantities of coal on the Mud Lick property, and that, while mining had actually occurred, the profitability was questionable from the start. There is no evidence to indicate why a second engineering evaluation was prepared by Arthur D. Thompson, or to whom it was sent, other than AMCOAL. The MA report provided no additional information concerning economic feasibility of the project or its potential profitability. The MA report did mention the current soft coal market and made some suggestions for improving production, but it did not address the issue of whether the program could make a profit from mining the property. The report failed to mention the cost of operating or developing the mine. Further, the *561 MA report made no specific mention of whether Mr. Thompson saw any core drillings and whether he actually sampled the Morris seam. While Mr. Thompson did provide certain production estimates, he did not indicate how he arrived at such estimates. The financial projections contained in the POM of the VMD program may have been prepared by an accountant who was not an expert. The primary purpose of the financial projections was to indicate to potential investors the existence of a deduction in excess of $ 75,000 in the first year of the program for a $ 25,000 investment per unit. Further, while the financial projections are based upon production of 120,000 tons per year, as required by the minimum mining commitment, a total of only 11,760.59 tons of coal were mined and sold in 1979 and 1980. The amount actually mined fell significantly short of the 1,440,000 ton minimum agreed to be mined over the life of the program. The petitioners have presented no further evidence to indicate that commercially marketable quantities of coal had been disclosed on the Mud Lick property before the expenditures were made under the VMD program. On such record, we hold that the petitioners have failed *562 to carry their burden of providing that the expenditures were deductible under section 616, and since they have not undertaken to establish that any of the expenditures were deductible under any other provision of law, we hold that the expenditures are not deductible. Such holding is dispositive of the losses claimed by the participants in the VMD program, and accordingly, we need not consider the other arguments made by the Commissioner. Satin Sewell No. 2 Mining Associates and West Virginia Peerless Mining Associates
The Commissioner fowards a plethora of arguments supporting the disallowance of the deductions claimed by the petitioners in connection with the SS No. 2 program and the WVP program. However, his primary argument is that these partnerships did not engage in their alleged coal mining activities with an actual and honest objective of making a profit, and therefore, the petitioners are not entitled to deduct their allocable share of the partnerships' claimed mine expenses. In Thomas v. Commissioner,84 T.C. at 1269, we held that the deduction under section 616(a) is premised on a finding that the activity giving rise to the deduction is an activity *563 engaged in with the primary purpose and objective of making a profit. The term "primary," as used in this context, means "of first importance" or "principally," and "profit" means economic profit, independent of tax savings. Seaman v. Commissioner,84 T.C. 564, 588 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). A reasonable expectation is not required, but the profit objective must be bona fide. Seaman v. Commissioner, supra at 588. The deductibility of any other mining expenses claimed by the partnerships must satisfy the requirements of section 162(a), including the same profit test. Thomas v. Commissioner,84 T.C. at 1283. The determination of whether the requisite profit objective exists is one of fact to be established on the basis of all of the surrounding facts and circumstances. Thomas v. Commissioner,84 T.C. at 1269; Seaman v. Commissioner,84 T.C. at 588; Ramsay v. Commissioner,83 T.C. 793, 180 (1984); Flowers v. Commissioner,80 T.C. 914, 931-932 (1983). The burden of proving this profit objective rests with the petitioners. *564 Rule 142(a), Tax Court Rules of Practice and Procedure; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight should be given to the objective facts than to mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Seaman v. Commissioner,84 T.C. at 588. The profit objective analysis must be made at the partnership level. Thomas v. Commissioner,84 T.C. at 1269; Seaman v. Commissioner,84 T.C. at 589; Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Siegel v. Commissioner,78 T.C. 659, 698 (1982). Therefore, we must examine the motives and objectives of the promoters and the general managers of the programs (Abraham Zimmerman, Martha Epstein, and AMCOAL). Seaman v. Commissioner,84 T.C. at 589; Surloff v. Commissioner,81 T.C. at 233. Having examined all of the evidence, we conclude that the petitioners have not carried their burden of proving that the SS No. 2 partnership and the WVP partnership were *565 organized and operated with the primary objective of realizing an economic profit. When we look past the petitioner's self-serving testimony to the objective facts, we are left with the undeniable impression that the primary objective behind the formation of these programs was to secure attractive tax write-offs for the participants. Initially, we observe that there was no expectation that the participants in the two programs would ever be called upon to pay the notes executed by them. Both the SS No. 2 partnership and the WVP partnership had mining development agreements and minimum mining commitments with Southern Eagle that ensured that the notes would be satisfied, if satisfied at all, by either coal sales proceeds or by the liquidated damages provided for in the minimum mining commitments. Under both programs, the mining development agreements provided for each note to be amortized at a certain rate per ton of coal sold. When this rate was applied to the amount of coal required to be mined and sold under the minimum mining commitments, the total was substantially the same as the principal and interest payments required pursuant to the note itself. In the event that the *566 minimum required tonnage was not delivered, then liquidated damages were to be imposed. The liquidated damages were set at a specified amount multiplied by the difference between the minimum requirement and the amount of coal actually delivered. A portion of those liquidated damages was to be offset against the promissory note. The net effect of the minimum mining agreements and the mining development agreements entered into between the partnerships and Southern Eagle was to ensure that participants would not be required to make additional out-of-pocket cash payments in order to amortize their notes. Furthermore, the face value of the note had no bearing on the amount Southern Eagle ultimately received for mine development, since such amount was wholly dependent on the results of mining. The notes were not used to provide cash flow to finance mine development, since cash flow was dependent upon mining as well. The notes had absolutely no apparent business purpose except to provide the participants with inflated tax deductions, which in turn made it easier for promoters to sell interests in the programs. Thomas v. Commissioner,84 T.C. at 1280-1282; Surloff v. Commissioner,81 T.C. at 237. *567 In that no further out-of-pocket payments would be due on the promissory notes executed by the participants in either program, each purchaser of an interest in the WVP program claimed to obtain an initial tax deduction of $ 74,400 for a total cost of $ 25,000. Likewise, each purchaser of an interest in the SS No. 2 program claimed an initial tax deduction of $ 44,840 for a total cost of $ 15,000. Accordingly, the participants in each program claimed the projected 3-to-1 tax write-off. The investigation into the economic feasibility of these programs was sorely lacking. The general partner for both programs was AMCOAL, and the principal shareholder, director, and president of AMCOAL was the petitioner. The petitioner had no experience in the business of coal mining, and the CMs distributed in both programs declared that "neither the general partner, nor its officers, have had technical training or business training in the area of coal mining." The petitioners contend that AMCOAL and the petitioner are experienced syndicators. However, they do not argue that either of them is experienced in the coal mining business, and syndication experience did not prepare them for the coal *568 mining business. The petitioner also contends that he obtained advice from J & A, a coal mining engineering firm, regarding both programs and that due to J & A's favorable reputation, he was able to rely totally on its advice and coal reports. Yet, there is no copy of a J & A report in the record with regard to the SS No. 2 program. We have only a summary of an alleged report contained in the CM, and on such record, we are not convinced that an adequate report was prepared by J & A concerning the economic feasibility of carrying on mining activities on the Wilson property. The WVP partnership did obtain a Reserve Analysis and Feasibility Study from J & A. However, upon a close analysis of the report, it is clear that such report is not a sufficient basis for determining that the development and operation of a coal mine on the Hedrick property would be economically feasible. The report contained as estimate of the prices to be received per ton of coal mined from the Hedrick property but gave no basis or explanation for such estimates. There was no discussion in the report concerning the marketability of the coal or current price of coal of similar quality. The report estimated *569 coal reserves on the Hedrick property in the amount of 1,210,000 tons, based on "available data" without explaining the data used. The report also devoted one paragraph to a mining plan which included a short outline of the different phases in a coal mining operation. The mining plan is clearly not of a quality that would be seriously considered in determining the economic feasibility of a mining operation. The Commissioner called Donald M. Bondurant as an expert witness, and he challenged the J & A report. Specifically, he observed that it lacked appropriate information concerning the quantity and quality of the coal to be mined and that it did not contain the necessary information concerning the costs and profits to be realized from mining. He took the position that the J & A report would not be acceptable in the mining industry as a feasibility study. In Surloff v. Commissioner, supra, we discussed a number of factors important in establishing a mining operation as follows: Opening up a coal mine or even a strip mining operation requires a large amount of captial * * *. Operating a coal mine profitably requires not only minable seams of coal but also miners *570 and machinery to mine and remove the coal from the mine or the face, water and electricity, access roads to and from entires, tipples and cleaning plants that are nearby and are capable of handling the coal, good roads or railroads from the tipple or cleaning plant to the point of distribution, and customers who will buy the coal at a price that will yield a profit. It must also be recognized that there may be strikes, mine closings because of whether, safety hazards, or other reasons, and that there may be variations in the cost of mining and transporting the coal, and the selling price of coal. * * * [81 T.C at 234-235.] It is clear from the record that none of the foregoing factors were seriously considered in the J & A or by AMCOAL and the petitioner prior to the development of coal mining operations with respect to the SS No. 2 program and the WVP program. The primary purpose of the J & A report was not to determine whether, in fact, the development of the property was commercially feasible, but rather to create some justification for the mining development expenses claimed by the WVP program and to create the impression that this program was a genuine coal *571 mining operation. The CM for both programs included a document entitled "Financial Projections." These projections purported to discuss whether these programs could be commercially feasible. The projections were prepared by Burton Lipkin, an accountant with no experience in coal mining, based solely on information provided by AMCOAL or the petitioners. In fact, Mr. Lipkin sets up coal prices for later years of the program with no explanations as to how he arrived at such figures. The projections merely incorporate the cost and amounts set forth in the CMs and are of little importance with regard to the decision to develop the property. Thus, the financial projections contained in the CM of both programs are not a competent economic analysis of the feasibility of the programs. Furthermore, the actual course of conduct of the programs after they were set up provides additional evidence that these programs were not operated with the actual and honest objective of making a profit. The evidence indicates that after AMCOAL received its management fees, it offered little attention to the programs from that point on. Southern Eagle purported to grant subleases of such properties, *572 warranted that it had title to the coal, and agreed to provide substitute or additional property if the coal could not be mined. Yet, Southern Eagle did not have title to the properties, never acquired such title, and never formally furnished substitute or additional properties. In face, Mr. Zimmerman was unaware, until preparing for this trial, that no coal had actually been mined by these programs on the Hedrick property or Wilson property. It seems that if the partnerships were engaged in the mining business with the bona fide objective of making a profit, greater care would have been exercised in seeing to it that the terms of the agreements were carried out. Thomas v. Commissioner,84 T.C. at 1276-1277. It is true that the operational failure of a particular transaction, in and of itself, does not destroy an otherwise valid profit motive; however, it is a relevant factor to be taken into account in determing whether there was an adequate preliminary investigation performed with respect to the property and whether the parties to the coal mine venture possessed a bona fide intent to mine and sell coal for economic profit at the time they entered into the operation. *573 Thomas v. Commissioner,84 T.C. at 1278. Pursuant to the programs' mining development agreements, minimum mining commitments, and mining services agreements, Southern Eagle agreed to provide 83,333 tons per year to the SS No. 2 program and to provide the WVP program with 120,000 tons of coal per year. In fact, no coal was mined on the Hedrick or Wilson property. Southern Eagle did mine coal on the Bowden Mine #1 property and allocated to the SS No. 2 and WVP partnerships 3,500 tons in 1981, 61,993 tons in 1982, 110,053 tons in 1983, and 54,896 tons in 1984. Thus, the actual production in those years was less than 10 percent of the minimum amount to be mined -- far short of the projected production. This vast shortfall in production caused the actual income to miss widely the projected income. According to the financial projections, a particpant in the SS No. 2 program would realize a total gain of $ 44,664 over the years, and the participants in the WVP program would realize a total gain of $ 108,000. The returns filed for the partnerships for 1981 through 1984 show a distributive share for one full interest as follows: SS No. 2
WVP
1981
($ 44,840.00)
($ 74,440.00)
1982
616.67 374.56 1983
4.50 9.22 1984
(146.17)
(1,275.42)
*574 This drastic failure to meet the projected goals is further evidence that AMCOAL and the petitioner failed to undertake an adequate investigation of whether these programs were economically feasible. Thomas v. Commissioner,84 T.C. at 1278. The petitioners maintain that the fact that the partnerships did engage in some mining activities, did produce some coal, and did sell that coal demonstrates that the partnerships were carrying on a business for profit. They argue that the financial problems encountered by the programs were attributable to unforeseen circumstances including market conditions and weather. However, the mining activity carried on by the partnerships is insufficient to convince us that they had a bona fide objective of making an economic profit. The failure to make an adequate investigation of the opportunity for profit, the lack of expertise, the failure to secure adequate expert advice, the emphasis on the tax benefits to be secured under the programs, and the overwhelming failure to achieve the stated objectives, all convince us that Mr. Zimmerman, AMCOAL, and the partnerships operated by them did not have a primary objective of making an *575 economic profit. The mining actually carried on by them was done solely to furnish some credibility to their claim. Thomas v. Commissioner,84 T.C. at 1271. The operation of the mines was doomed from the outset; the failure was not attributable to unforeseen weather or economic conditions. Based on this record, the petitioners have not sustained their burden of proving that either the WVP partnership or the SS No. 2 partnership engaged in coal mining activities with the primary objective of making a profit. Therefore, the development expenses claimed by each partnership pursuant to section 616(a) and the administrative costs claimed under section 162 must be disallowed in full. Thus, the petitioners' claim losses from their interest in the partnerships must also be disallowed. The next issue for decision is whether the underpayment of income tax for the petitioners' taxable year 1981 is the result of tax motivated transactions, thereby causing all interest accruing on that underpayment after December 31, 1984, to be at a rate equal to 120 percent of the otherwise applicable rate, pursuant to the provisions of section 6621(c). [4] That section is applicable to *576 "any substantial underpayment" (an underpayment exceeding $ 1,000). Sec. 6621(c)(1) and (2). Section 6621(c)(3)(A) describes several transactions that are treated as tax motivated transactions. Section 6621(c)(3)(B) states in part: "The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection." Temporary regulations issued under such authority take the position that any deduction disallowed under section 183 is a tax motivated transaction and the additional interest under section 6621(c). Sec. 301.6621-2T, A-4(1), Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). The application of this provision of the regulations has been approved in Harmon v. Commissioner,T.C. Memo. 1986-305, and Seely v. Commissioner,T.C. Memo. 1986-216. The Commissioner argues that the 1981 programs, that is, the SS No. 2 and the WVP Partnerships, were not organized for profit within the meaning of section 183 and that, therefore, *577 the underpayments for 1981 are subject to additional interest under section 6621(c). We have held that the activities carried on by the SS No. 2 and WVP partnerships were not carried on for profit within the meaning of section 183, and consequently, we hold that the underpayments of tax for 1981 are subject to additional interest under section 6621(c) for the period beginning after December 31, 1984. The additional interest accrues after December 31, 1984, even though the activities were entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The final issue for decision is whether the petitioners are liable for damages under section 6673. Section 6673 provides, in part, that damages up to $ 5,000 shall be awarded to the United States whenever it appears that proceedings before the Tax Court have been instituted or maintained primarily for delay or that the taxpayer's position in such proceeding is frivolous or groundless. The petitioners contend that because these partnerships mined coal, they cannot be held liable for damages *578 under section 6673. This contention is not convincing. In Oneal v. Commissioner,84 T.C. 1235, 1243-1245 (1985), we said: In spite of numerous Court opinions squarely on point, petitioners have forced an already overburdened Court and tax system to unnecessarily consume precious resources. Petitioners, and others who participate in specious tax strategems, must accept the consequences of their actions. * * * We also have stated, in Elliott v. Commissioner,84 T.C. 227, 248 (1985), that "At some point, the arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as 'frivolous or groundless,'" citing section 6673. We have frequently found that cases based upon meritless contentions and stale arguments are burdensome both on this Court and upon society as a whole. See Abrams v. Commissioner,82 T.C. 403 (1984). The time spent upon this case has delayed other cases of merit which could have provided new precedents to the tax system. * * * The tax shelters at issue in this case are not distinguishable from that considered in Thomas v. Commissioner, supra; in both, some coal was *579 mined. Although the coal mined in this case exceed that mined in Thomas, it still fell far, far short of what was necessary to reach profitability, and it was not enough to convince us that the activity was engaged in with a bona fide profit objective. In addition, this Court has been required to spend time considering many other coal tax shelters. See Capek v. Commissioner,86 T.C. 14 (1986); Seaman v. Commissioner,84 T.C. 564 (1985); Thomas v. Commissioner,84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Surfloff v. Commissioner,81 T.C. 210 (1983). Here, the petitioners never even proved that they actually made an investment in the VMD program, and the SS No. 2 and the WVP partnerships never ever acquired an interest in the coal allegedly to be mined. After careful consideration of the entire record in this case, we hold that the petitioners' positions were frivolous and groundless and that these proceedings were instituted primarily for delay. In our discretion, we have determined that damages pursuant to section 6673 will be awarded to the United States in the maximum amount of *580 $ 5,000 when the decision is entered. An appropriate order will be issued restoring this case to the general docket for trial of other issues.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. ↩
2. The Tax Opinion was not included in the POM which was made a part of the record. ↩
3. For tax purposes, the participants in the VMD program treated the arrangement as one in which they became co-owners of the property. The Commissioner is of the opinion that, in fact, the participants became members of a partnership, but he has not taken that position for purposes of this case. ↩
4. Former sec. 6621(d) was redesignated as sec. 6621(c)↩ by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744.