**Larry R. ADKINS and Sondra Adkins, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 88–1466.**

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 24, 1989.

Decided May 18, 1989.

**138**

Gary R. Allen, Chief, William S. Rose, Jr., Gilbert S. Rothenberg, Mary Frances Clark, Asst. Attys. Gen., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for appellants.

William R. Klein, Sarasota, Fla., for appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The Adkins seek review of a Tax Court decision determining a deficiency in income tax for 1979. The court disallowed $20,000 in deductions and determined that $16,000 additional income should have been reported. The decision is reported as *Gray v. Commissioner*, 88 T.C. 1306 (1987).

The deductions and unreported income stemmed from a tax shelter program colorfully dubbed "Gold for Tax Dollars" by its promoters. The details of the plan (which was also offered in slightly varied form for 1978 and 1980), as described in promotional materials, are explained at length in this Court's decision in *Saviano v. Commissioner*, 765 F.2d 643 (7th Cir.1985).

The "Gold for Tax Dollars" plan proposed to take advantage of deductions from taxable income available for "all expenditures paid or incurred during the taxable year for the development of a mine ... if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." 26 U.S.C. § 616(a). Hoping to convince ordinary investors to become miners, the plan advertised (for 1979) a 4:1 ratio of income deduction to cash investment: the "miner" who put up $5,000 could deduct $20,000 from taxable income that year.

This is how International Monetary Exchange (IME), the promoter of the program, proposed in 1979 to transform taxpayers into gold miners: The investor would deposit with IME one-fourth of the desired deduction. The investor obtained at no cost, through IME, a mineral lease from Compagnie Miniere Paul Isnard, S.A. (CMPI SA). CMPI SA held a gold mining concession from the government of French Guiana. The lease covered a specific quantity of gold-bearing gravel located at a particular zone on the CMPI SA concession, and each lease supposedly was to be developed as a distinct "claim." The "miner," again through IME, would sell to a third party a "gold option" for an amount equal to the other three-fourths of the desired deduction. This "gold option" gave the buyer of the option the right to buy gold at a fixed price from the particular claim, but only after the gold was extracted. The miner was under no obligation to extract any gold. The proceeds of the "gold option" sale, plus the original money deposited with IME, were supposedly paid by IME on behalf of the investor to General Miniere, S.A., a mining contractor which agreed to develop the claim. The investor would claim as a deduction the total amount of the cash investment and the option sale proceeds as mine development expenses under § 616(a). The investors would not report the option proceeds as income in 1979 because as IME informed them, no income was reportable until the option expires or is exercised. In *Saviano*, the Tax Court concluded that the right sold was "not a binding, legal option." 80 T.C. 955, 971 (1983), *aff'd* 765 F.2d 643 (7th Cir.1985). This court, noting that Saviano did not attempt to argue that this was a true option, rejected *Saviano*'s alternative theories why the proceeds were not income when received. 765 F.2d at 652–54.

For some unexplained reason, *see Saviano v. Commissioner*, 80 T.C. 955, 967 n. 16 (1983), the Adkins received a 5:1 deduction-to-investment ratio: they invested $4,000 cash, obtained $16,000 in option proceeds which were also purportedly spent on their behalf, and claimed a mining development expense deduction of $20,000. They did not report the proceeds of the option sale as income received in 1979. The Adkins report on a cash basis.

In *Saviano*, the matter was decided on cross-motions for summary judgment on specified issues, and it was assumed for that purpose that the transactions were consummated in the manner set out in the promotional and related documents. 80 T.C. at 956. In fact, *Saviano* did not deal with 1979 deductions, but, as to that year, decided only that the purported option was not a true option and the proceeds did not qualify for tax deferral.[1]

In the case presently before us, however, there was a trial, and the Tax Court found in substance, among other things:

The mineral claim leases were totally fictitious. Twenty-five hundred (2500) or more plots in French Guiana were supposed to have been leased to IME's 1979 and 1980 tax shelter investors, but only 100 to 200 plots were ever even laid out on paper. The leases were issued sequentially without reference to any geographical location. Each reflected a number of cubic feet of auriferous gravel, but had no relationship to any actual gravel in an identifiable location. One plot, assigned to a Dr. Yuter, had been worked, but with that exception, it was not possible to locate any specific plot by referring to the claim number assigned to any investor by IME.

As stated by the Tax Court:

The bogus nature of the "lease" and development of these individual plots is emphasized by expert testimony at the trial that small plots, such as those purportedly sold by IME–Rogers, could not realistically be developed and mined, separate and apart from exploitation of the entire tract from which the plots were represented to be carved. But it was absolutely essential to the rationale of the tax scheme that the separate plots not be recharacterized as undivided interests since that would have raised the spectre of partnership treatment under the at-risk rules of sections 465 and 704(d), a fact carefully noted in tax opinion letters distributed with the promotion material.

88 T.C. at 1324–25.

The investors were given a copy of a cancelled check to represent the alleged option sale proceeds. The Tax Court found that "the check merely represented the transfer of funds from one [ ] shell company to another." *Id.* at 1324. The court referred to the claimed development expenses as "fictitious." The implication from all the findings is clear that the Tax Court found that no money was paid in 1979 on behalf of an investor for development of a particular mining plot.

Noting that transactions entered into primarily for tax benefits are not profit motivated, the Tax Court found that "the real profit that petitioners were looking toward was a large decrease in their tax liability from tax deductions as a result of small cash payments." *Id.* at 1326.

As its "Ultimate Finding of Fact," the Tax Court said, "The IME Gold for Tax Dollars promotion was a fraudulent factual sham."

The court disallowed the Adkins' entire deduction, and treated the $16,000 as 1979 income.[2] It calculated total tax deficiency

---

1. See, however, Judge Campbell's acidic comment concerning the credibility of the assumption that the transactions occurred as the promoters claimed. 765 F.2d at 654.

2. At one point, the Tax Court seems to have thought that *Saviano* disallowed the portion of the 1979 deduction of the amount of option sale proceeds, and to have relied on that interpretation of *Saviano* in disallowing the $16,000 deduction claimed in this case. 88 T.C. at 1322. Actually, *Saviano* did not deal with any 1979 *deductions*, but only with whether the option proceeds were to be considered current reportable *income.* The inaccuracy of such reliance by the Tax Court makes no difference, however. Whether the Adkins are entitled to deduct the $16,000 option proceeds is the same question as whether they are entitled to deduct the $4,000

of $18,114, and because the court concluded that the transactions were motivated primarily for tax benefits, imposed interest on the underpayments at 120% the normal rate pursuant to 26 U.S.C. § 6621(c) (1984).[3] *Id.* at 1328–29.

It is impossible to read the Appellants' brief as a challenge to the Tax Court's findings of fact or legal analysis.[4] Although in its Summary of the Argument, the brief claims the "Court erred in contradicting itself as to whether appellants had entered the transactions for profit" and that the "Court erred in disallowing petitioners' deductions for 1979," one searches the brief in vain for a coherent, or indeed, for *any* explanation of these assertions. While the Commissioner's brief (surely out of an abundance of caution) defends at length the merits of the decision to disallow the tax deductions and treat the option proceeds as 1979 income, we will only address the few arguments actually raised by the appellants' brief.

Those issues, as best we can discern, arise from (1) the Tax Court's refusal to be bound by certain factual findings made in an action in California involving the "Gold for Tax Dollars" plan; (2) alleged prejudice on the part of the trial judge; (3) the court's refusal to admit certain testimony; and (4) an alleged procedural irregularity.

## I. COLLATERAL ESTOPPEL

Before trial, citing the findings of fact in *Securities Exchange Commission v. Rogers*, No. CV 80–4841NRP (C.D.Cal.1985), *aff'd* 790 F.2d 1450 (9th Cir.1986), counsel for the Adkins moved "for *res judicata*, and for the operation of collateral es-

topp[e]l to the holding and everything involved therein."

*Rogers* was an action brought by the S.E.C. against Gerald L. Rogers, IME, and eighteen others, alleging that they violated the securities laws in connection with the "Gold for Tax Dollars" promotion.

Violation of the anti-fraud provisions was alleged, along with the sale of unregistered securities and the like. The trial occurred in 1982. IME defaulted, and on September 14, 1982, the district court enjoined IME from violating section 10(b) and ordered it to account to investors. 790 F.2d at 1461 (Judge Noonan, dissenting). In 1985, the district court made numerous findings, generally unfavorable to the S.E.C. Judgment was entered in favor of Rogers, at least, and the S.E.C. appealed. A divided panel of the Ninth Circuit affirmed, although it is not clear what happened to the injunction against IME. It seems fair to say that the findings principally treated in the majority opinion were those determining that Rogers' participation in the program was much more limited than claimed by the S.E.C.

The concluding paragraph of the opinion was:

The district court's findings that Rogers did not participate in the sale of unregistered securities are not clearly erroneous. Because Rogers did not participate in the sale of securities, he had no duty to disclose material information. Further, the district court's findings that Rogers did not make material misrepresentations are not clearly erroneous.

■ It is clear that the Adkins cannot claim *res judicata*. The identities of

---

cash investment, and the findings made support the disallowance of both. (It does occur to us that a logical argument might perhaps have been made—accepting the finding that no option proceeds were in fact spent for the benefit of the investors—that the investors did not underreport their income because they never received any option proceeds, constructively or otherwise. The Adkins, however, made no such alternative argument, and we do not reach it.)

**3.** In the same decision, the Tax Court also assessed deficiencies in eight companion cases, each involving deductions based on "Gold For Tax Dollars" investments. The Sixth, Eighth and

Ninth Circuits have affirmed as to five. *See Kennedy v. Commissioner,* 876 F.2d 1251 (6th Cir.1989) (two cases); *Becker v. Commissioner,* 868 F.2d 298 (8th Cir. 1989) (two cases); *Armstrong v. Commissioner,* 869 F.2d 1496 (9th Cir.1989). Another Tax Court decision involving different taxpayers reached a similar outcome. *Smith v. Commissioner,* 51 TCM 599 (1986).

**4.** The Appellant's brief, filed by William Randolph Klein of Sarasota, Florida, is of very poor quality, contains inaccuracies, and violates rules of appellate procedure. It has been singularly unhelpful to this court.

claims and parties are lacking. *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

As to the claim of collateral estoppel against the Commissioner (United States), the Adkins assert that the district court's findings of fact in *Rogers* "would sustain petitioners' position," but fail to describe exactly how, or indicate the findings on which they rely. Their reply brief, however, does quote all or parts of 49 findings. We have read them with care, and conclude that although there are many findings favorable to the promoters (and adverse to the S.E.C.) concerning the fraud claims, only three findings bear at all upon the question whether, in 1979, investors had leases of identifiable mining tracts on which the existence of minerals had been disclosed, and whether, in that year, money was paid out on their behalf for the development of such tracts.

The three findings follow:

Page 4, No. 11: "General Miniere, S.A. ('GEMSA'), a Panamanian corporation which was not named as a defendant, was the development contractor that IME paid on behalf of investors for development expenses in 1979 and 1980."

Page 17, No. 9: "With respect to development expenses, when IME acted as agent for the investors, IME executed development contracts on their behalf with General Miniere, S.A., a Panamanian corporation, to perform mining services. General Miniere, S.A. invoiced IME in the name of the individual investors for the full amount of development expenses and IME paid that amount by check to General Miniere, S.A. Copies of the checks were provided to individual investors for their records."

Page 30, No. 10: "In 1980 and 1981, a number of individual lots were laid out in the Paul Isnard Concession. [French Guiana]. Many of these lots were surveyed. These lots ranged in size from 10,000 cubic meters to 12,000 cubic meters."

It seems clear that these findings do not purport to establish, as to any particular investor or group of investors, that their individual leased mining property had been identified, minerals discovered upon it, and expenditures paid or incurred upon it in 1979. Although Finding No. 9 can be read as establishing the payment of money for development purposes on the date indicated on the copy of check furnished each investor, there is no finding tying such payment to an identifiable plot of ground.

The government argues that nonmutual offensive collateral estoppel, approved with limitations in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed. 2d 552 (1979), does not apply against the United States. *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

Although *Mendoza* does say "that *Parklane Hosiery*'s approval of nonmutual offensive collateral estoppel is not to be extended to the United States," 464 U.S. at 158, 104 S.Ct. at 571, other passages in the opinion arguably leave open the possibility that estoppel may apply against the government with respect to specific fact determinations, not embracing policy choices and legal issues, *e.g.*, "We hold, therefore, that nonmutual offensive collateral estoppel simply does not apply against the Government *in such a way as to preclude relitigation of issues such as those involved* in this case." 464 U.S. at 162, 104 S.Ct. at 573 (emphasis supplied, footnote omitted).

In any event, in order for a determination of fact subsumed in an earlier judgment to be preclusive in a later action, the determination of that issue must have been necessary to the judgment, *Mendoza*, 464 U.S. at 158, 104 S.Ct. at 571, and must have been "distinctly put in issue and directly determined." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951).

The issue of entitlement to a deduction was, of course, not before the court in *Rogers*. In order to establish such entitlement, the Adkins had to prove (1) that by 1979 they had acquired a leasehold in a specific mine property in which the existence of ores in commercially marketable quantities had been disclosed, (2) that their

money had been paid in 1979 for the development of their mine, and (3) that they acted in the hope of a profit from the investment and not primarily to obtain tax benefits. *See Fox v. Commissioner*, 82 T.C. 1001 (1984).

We are not persuaded that any of these narrow issues of fact was actually and necessarily litigated in *Rogers*, and conclude that the findings quoted from *Rogers* do not determine them, although perhaps coming close in respect to the payment on their behalf of development expenses generally.

## II. OTHER ALLEGED ERRORS

■ While complaining of judicial prejudice, the Adkins cite nothing in the record which could convince a reasonable person that Judge Nims was biased against them. *United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir.1985). Bias cannot be inferred merely from adverse rulings, nor can litigants complain of "bias" resulting from knowledge gained by a judge in the course of a trial. *McLaughlin v. Union Oil Co. of California*, 869 F.2d 1039, 1047 (7th Cir.1989); *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). Judge Nims was aware of and familiar with *Saviano*. His comments regarding the taxpayers' need to show him the difference between that case and their own were justified. Any skepticism the judge showed about the legitimacy of the mining adventure as a whole was warranted by his familiarity with the "Gold For Tax Dollars" scheme, and reflected the fact that the Adkins carried the burden of proving the validity of their claimed deductions.

The court excluded as irrelevant the testimony of William Hofius, offered by the Adkins as a "mining engineer" who could testify about the French Guiana mining operations, the amount of gold at the site, and the amount of money spent on development during 1979 and 1980. Mr. Hofius' expertise is disputed—the Commissioner claims he is a businessman, not an engineer. It is undisputed that Mr. Hofius didn't arrive on the scene until May or June of 1981, and thus had no personal knowledge of the mining operations in 1979, the year which the Adkins claimed their deductions.[5] While the Adkins suggest that Mr. Hofius could have given his opinion concerning the 1979 activities based on his 1982 observations, we see no abuse of discretion in the court's decision to exclude testimony which may well have been speculative.

Finally, while the Adkins say they were prejudiced in the way their case was handled by the court (which was simultaneously juggling hundreds of "Gold for Tax Dollars" cases), they don't explain how. They claim to "have gone to trial twice in this matter," once in 1985 and again in 1986. The first 1985 "trial" apparently consisted of a calendar call, argument of certain motions, and a brief hearing for a group of approximately 100 "Gold For Tax Dollars" cases, including the Adkins'. No decision was rendered after the hearing; Judge Nims apparently viewed it as an opportunity to refine the issues for later trial. The Adkins offer no support for their assertion that "it is conceivable that [they] could go to trial again, pursuant to [the 1985] proceedings, despite the court's determination of the 1986 proceedings." Their case was tried fully in April of 1986, and all the issues were resolved. Further litigation over the 1979 tax liability issues in this case would be barred. *Commissioner v. Sunnen*, 333 U.S. 591, 598–99, 68 S.Ct. 715, 719–20, 92 L.Ed. 898 (1948).

None of the issues presented by Appellants has merit. The decision of the Tax Court is AFFIRMED.

---

**5.** For this reason, there was also no error in excluding evidence of alleged interference by the United States government in the French Guiana mining operation which happened after 1979.