PAUL R. SCHOUTEN AND MARY KAY SCHOUTEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schouten v. Commissioner
Docket No. 48491-86
United States Tax Court
T.C. Memo 1991-155; 1991 Tax Ct. Memo LEXIS 174; 61 T.C.M. (CCH) 2357; T.C.M. (RIA) 91155; April 8, 1991, Filed *174 Decision will be entered under Rule 155. George P. Latchford and James B. Rice, for the petitioners. Marjory A. Gerdes and James C. Lanning, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in, and addition to, petitioners' Federal income tax: Addition to Tax
Year
Deficiency
Section 6653(a)
1979
$ 46,173
$ 2,309
1980
32,556  0  (All section references are to the Internal Revenue Code, as amended.) After concessions, the issues for decision are: (1) Whether petitioners are entitled to a deduction under section 616(a) for mine development expenditures of $ 16,000 allegedly paid to a partnership called Westates Development Company; (2) whether respondent properly used the cash receipts and disbursements method of accounting under section 446 in determining petitioners' distributive share of income from a partnership called Mine-Rite Mining Company; and (3) whether petitioners are entitled to deduct $ 601 in 1979 and $ 34,410 in 1980 as their distributive share of losses realized by a partnership called American Mining Trust. Throughout this opinion, we *175 use the words "investor," "investment," "promissory note," "security agreement," "security interest," "agency agreement," "mineral claim lease," "mining contract," "mine," "ore," "contractor," "development work," "gold," "silver," "copper," and other such terms merely for convenience and simplicity. They are not intended by their use to imply any conclusion as to the character of the transactions at issue for Federal tax purposes, or as to the mineral content of the earth or rock described herein. FINDINGS OF FACT The parties have stipulated some of the facts, which are so found. The Stipulation of Facts, First Supplemental Stipulation of Facts, Stipulation of Settled Issues, and attached exhibits are incorporated herein by this reference. Petitioners filed joint Federal income tax returns for the years 1979 and 1980. At the time they filed their petition in this case, they resided in Palos Heights, Illinois. In 1979, Mr. Paul R. Schouten, referred to herein as petitioner, was an attorney engaged in the practice of law on a full-time basis in the State of Illinois. During that year, he was approached by Mr. Philip Schouten and Mr. Lawrence Van Someren because, according to *176 petitioner, they "wanted to create their own mining shelter." Mr. Philip Schouten was an accountant and also petitioner's uncle. Mr. Philip Schouten and Mr. Van Someren had previously invested in so-called "mining programs" which offered investors Federal income tax deductions for mining development expenditures under section 616. One of those investments was a tax shelter called "Gold for Tax Dollars," sponsored by an entity called International Monetary Exchange. That tax shelter is the subject of a number of opinions of this and other courts. See, e.g., Gray v. Commissioner, 88 T.C. 1306 (1987), affd. sub nom. Becker v. Commissioner, 868 F.2d 298 (8th Cir. 1989), affd. without published opinion sub nom. Armstrong v. Commissioner, 869 F.2d 1496 (9th Cir. 1989), affd. sub nom. Adkins v. Commissioner, 875 F.2d 137 (7th Cir. 1989), affd. sub nom. Kennedy v. Commissioner, 876 F.2d 1251 (6th Cir. 1989); Saviano v. Commissioner, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985); Yuter v. Commissioner, T.C. Memo 1990-108 (on *177 appeal); Hines v. Commissioner, T.C. Memo 1989-17, affd. without published opinion 893 F.2d 1330 (3d Cir. 1989); Smith v. Commissioner, T.C. Memo 1986-101; see also Securities and Exchange Commission v. Rogers, 790 F.2d 1450 (9th Cir. 1986); Horn v. Commissioner, 90 T.C. 908 (1988); Howard v. Comimissioner, T.C. Memo 1988-531; United States v. Rogers, 636 F. Supp. 237 (D. Col. 1986); Securities and Exchange Commission v. International Mining Exchange, Inc., 515 F. Supp. 1062 (D. Col. 1981). The other investment was a mining program sponsored by an entity called Argus Resources which followed the same format as the Gold for Tax Dollars program. An official of Argus Resources, Mr. Robert Hughes, consulted with Mr. Philip Schouten and Mr. Van Someren about the organization of the tax shelter which was ultimately formed in this case. He introduced them to another individual, Mr. Robert Morris, who was the chief executive officer of a corporation called Bullion Monarch Company. Mr. Morris also consulted with petitioner, Mr. Philip *178 Schouten, and Mr. Van Someren about the organization of a mining tax shelter and introduced them to a retired mining engineer, Mr. R. O. Camozzi. At that time Mr. Camozzi was approximately 70 years old and was no longer physically able to visit mine sites. He was the principal officer of a Mexican corporation, Camco Industrias, S.A. C.V., and a Nevada corporation, Jarbridge Gold and Silver Mining Company. In November or December of 1982, he became ill and died after undergoing open heart surgery. During 1979, petitioner organized the three partnerships which are central to the issues in this case, Westates Development Company (Westates), Mine-Rite Mining Company (Mine-Rite), and American Mining Trust. Westates had three partners, petitioner and two associates from his law office, Mr. James Wolfenson and Mr. Patrick Cleary. During 1979 and 1980, each of them had a one-third interest in Westates' capital, profits, and losses. Mine-Rite was organized in December of 1979. During 1979 and 1980, its partners and their respective interests in the partnership's capital, profits, and losses were as follows: Partnership
Partner
Interest Paul R. and Mary Kay Schouten
25 percent
Philip J. and Dorothy L. Schouten
25 percent
Lawrence and Alma Van Someren
50 percent
*179 The last of the three partnerships, American Mining Trust, had three partners, petitioner, Mr. Van Someren, and Mr. Philip Schouten, and during 1979 and 1980, each of them had a one-third interest in its capital, profits, and losses. Petitioner had no training or experience in mining. In structuring the "mining shelter" at issue in this case, he took the operative legal documents which formed the basis of certain of the programs sponsored by International Monetary Exchange and Argus Resources and revised them to reflect differences in the names of the entities, the type and location of minerals to be mined, and the like. As structured by petitioner, the mining shelter in this case is similar to the 1978 version of the Gold For Tax Dollars shelter described in Gray v. Commissioner, supra, and Saviano v. Commissioner, supra.
The mining program in this case offered investors a tax deduction under section 616(a) for mine development expenses in an amount equal to four times their cash outlay. Under the program, a typical investor paid Westates one-fourth of the amount of the deduction he desired for 1979 and executed a promissory note *180 to Westates for the other three-fourths. Westates, purportedly acting as agent for the investor, arranged "to fund" the investor's promissory note by borrowing an amount equal to the face value of the note from American National Bank of Chicago, a bank at which Mr. Van Someren conducted business. By prearrangement, the proceeds of that loan, together with the cash paid by the investor, were transferred to an account at the same bank maintained by Mine-Rite. Ostensibly, the purpose of this transfer of funds to Mine-Rite's account was to pay Mine-Rite for mine development work. Nevertheless, the monies transferred were used to purchase certificates of deposit which were immediately pledged as collateral for Westates' loan and, when they matured, the proceeds were used to pay Westates' loan from the bank. As a result, Mine-Rite ended up with the cash paid to Westates by the investor. The record in this case does not satisfactorily explain why Mine-Rite paid Westates' loan. There is also no evidence that any investor became liable to American National Bank by reason of Westates' "funding" of his promissory note at the bank. Finally, there is no evidence that any investor ever *181 paid his promissory note to Westates nor is there evidence that Westates, Mine-Rite, the bank, or any other entity ever sought to enforce a promissory note signed by any of the investors. All of the notes were forgiven at the end of 1982 or at the beginning of 1983. The promotion in this case involves four mines, two in Mexico and two in Nevada. The two Mexican mines were located in the State of Durango, Mexico. Petitioner testified that one of them, San Andreas, was principally a silver mine. He said that the other, San Jeronimo, was principally a gold mine. Both mines had been abandoned for approximately 30 to 40 years. One of the two mines in Nevada, called Adelaide, was located in Golonda, Nevada, and was said to contain copper/silver ore. The other Nevada mine was called Jarbridge. The record does not describe its location or its purported mineral content. Mine-Rite did not itself engage in any development work. Rather, it entered into "joint venture" agreements with corporations owned or controlled by Mr. Camozzi and Mr. Morris, purportedly for the purpose of having them do the development work. Three such joint venture agreements were entered into covering the four *182 mine sites. One joint venture, variously referred to as Camco Industrias or Camco Industries, covered the two Mexican mines and was composed of Camco Industrias, S.A. C.V., Bullion Monarch Company, and Mine-Rite. A second joint venture, variously referred to as Jarbridge Mining Co. or Jarbridge Gold & Silver Corp., covered the Jarbridge mine and was composed of Jarbridge Gold and Silver Mining Company, Bullion Monarch Company, and Mine-Rite. The third joint venture, referred to as M.B. Mining Company, covered the Adelaide mine, and was composed of Bullion Monarch Company and Mine-Rite. Each of the three joint ventures described above was an entity separate from the other two and from Mine-Rite. Transfers of money from Mine-Rite to each of the three joint ventures were labeled "advances" in Mine-Rite's general ledger and were labeled "capital" on trial balances prepared for the joint ventures. For example, Mine-Rite's general ledger for 1979 shows "Advances to Camco" in the aggregate amount of $ 30,000 and the 1979 trial balance for the Camco Industries joint venture shows "Capital - Mine-Rite" in the amount of $ 30,000. Similarly, Mine-Rite's general ledger shows "Payments *183 to Camco" for 1980, in the aggregate amount of $ 443,904.45 and Camco's trial balance for 1980 shows "Capital" in the amount of $ 443,904.45. Similarly, trial balances prepared for Mine-Rite for both 1979 and 1980 refer to "Investment in Camco." Ultimately, there were approximately 35 investors in the mining program, including petitioner. Petitioner promoted the investment to his parents and to three brothers who owned Indeck Power Equipment Company, one of petitioner's clients. Mr. Philip Schouten promoted the investment among the clients of his accounting practice and Mr. Van Someren promoted the investment among his business associates and controlled businesses. On December 4, 1979, petitioner effected his investment in the Westates program through the following prearranged and integrated steps. First, he paid $ 4,000 to Westates, and executed a $ 12,000 promissory note, in which he agreed to pay Westates three equal installments of $ 4,000 each, due on January 1, 1981, June 1, 1981, and January 1, 1982, including interest of 15 percent per annum. As set forth in a document entitled "Security Agreement," the promissory note was secured by petitioner's mineral claim lease, *184 which is described below. Second, petitioner executed an agency agreement which, among other things, authorized Westates to (1) "assist in arranging to fund" the promissory note, (2) pay a contractor to develop his mineral claim lease at a fee of $ 400 per ton of ore, (3) after the development work was completed, retain "an extraction contractor willing to deduct cost of extraction solely from production at a cost of 200 per ton of ore," and (4) receive a "commission of ten percent of the market value of the gold at the time of production." Third, petitioner and Camco Industrias, S.A. C.V., executed a document entitled "Canelas Mining District San Jeronimo Gold & Silver Mine Concessions Mineral Claim Lease" (mineral claim lease). The mineral claim lease purportedly assigns to petitioner "the mineral rights to the proven gold/silver reserves owned by Camco Industrias, S.A. C.V., on the real estate located in Durango State, Mexico, on forty tons of mineral bearing ore hereinafter referred to as Claim Number 79-134, the Premises." The mineral claim lease also sells to petitioner for $ 1 "all merchantable, commercially available and economically recoverable gold and silver that can *185 be recovered by removing and processing all material bearing ore discovered on the Premises." Petitioner's consideration for the mineral claim lease was his agreement "to expend $ 400.00 for development to ready the claim for extraction for each ton of ore contained in said Premises as expeditiously as possible, but no later than December 31, 1979." The mineral claim lease provides that Camco "shall not be entitled to proceed against the Miner [i.e., petitioner] or any of his assigns or heirs for any interest, sales or legal expenses or lease balance owing." Significantly, the mineral claim lease contains no representation that the claim contains gold, silver, or ore containing gold or silver. Fourth, petitioner claims to have entered into a document entitled "Mining Contract" with Mine-Rite. The "Mining Contract," which forms a part of the record in this case, is executed by "Authorized Agent for Lessee Paul R. Schouten," a partner of Westates. It sets forth the identity of the investor and the location of the property to be mined in its opening paragraph as follows: an owner of a divided interest in certain silver deposits and the mining rights and privileges appurtenant *186 thereto which are more particularly hereinafter described as hereinafter referred to as "Lessee" (see Exhibit attached). [Emphasis supplied.]
No "Exhibit" is attached to the "Mining Contract" contained in the record in this case. Moreover, petitioner testified that his mineral claim lease was for ore contained in the San Jeronimo mine which he described as "principally a gold mine." The "Mining Contract" further provides that Mine-Rite, as "Miner," "shall perform the development outlined in Exhibit 1, attached hereto, for $ 400.00 per ton, and to perform or cause to be performed all extraction work on said ore to produce gold/silver bullion for Cost of $ 200.00 per ton." Significantly, the "Mining Contract" contained in the record of this case contains no "Exhibit 1" and the nature of the work to be performed is not otherwise described therein. Finally, the "Mining Contract" provides as follows: In no event shall Lessee [i.e., investor] be personally liable for the payments or the performance of the Miner [i.e., Mine-Rite] other than from proceeds derived from the production and sale of gold/silver and in the event of any default, no deficiency or other personal judgment *187 will be requested or entered against Lessee with respect to the obligations contained herein.
Petitioners' joint Federal income tax return for 1979 includes Schedule C, Profit or (Loss) from Business or Profession, for a "mining" business. It reports no gross income or sales from the "mining" business but claims a deduction in the amount of $ 16,000 for "development work." Petitioners' joint returns for taxable years 1979 and 1980 fail to report losses or profits from Mine-Rite or American Mining Trust. During 1979 and 1980, Mine-Rite received the transfers of monies from Westates, described above, and also realized interest income. Nevertheless, Mine-Rite failed to file timely partnership returns. It did not apply for or obtain permission to extend the time to file such returns. Similarly, American Mining Trust failed to file timely partnership returns for 1979 and 1980, and it did not apply for or obtain permission to extend the time to file such returns. In 1983, respondent audited Mine-Rite's 1979 and 1980 taxable years. After examining the partnership's books and records, respondent's agent, Mr. Tom Ridgeway, prepared IRS Form 4605, Examination Changes -- Partnerships, *188 Fiduciaries, Small Business Corporations and Domestic International Sales Corporations (examination report), dated March 8, 1983. The examination report computes Mine-Rite's income based on the cash receipts and disbursements method of accounting. That computation is summarized as follows: 1979
1980
Operational
Income
$ 310,000 $ 333,750 Allowable
Deductions
(4,865)
(84,414)
Ordinary
Income (Loss)
305,135 249,336 The examination report also proposes assessment of penalties against Mine-Rite under section 6698 for failure to file returns for 1979 and 1980. On April 1, 1983, Mr. Philip Schouten agreed to the proposed adjustments and penalties, and signed the examination report as "Philip J. Schouten-Partner." As mentioned above, Mr. Philip Schouten is an accountant who was the Mine-Rite partner responsible for keeping the partnership's books. On September 26, 1983, approximately 6 months later, Mine-Rite filed Forms 1065, U.S. Partnership Return of Income, for its taxable years ending December 31, 1979, and December 31, 1980. They state that the partnership's accounting method is the "completed contract" method and they compute net losses for Mine-Rite *189 of $ 4,864 and $ 22,367, respectively. Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., attached to the returns, state that petitioners' distributive share of such losses is $ 1,216 in 1979 and $ 5,592 in 1980. Mine-Rite's returns for 1979 and 1980 were prepared under the direction of a member of Mr. Philip Schouten's accounting firm, Mr. Richard E. Lloyd, Jr. Mr. Lloyd is a certified public accountant who had invested $ 1,000 in the mining program at issue in this case. Before preparing Mine-Rite's returns, Mr. Lloyd prepared trial balances from the books and records maintained on behalf of the partnership. He then made adjustments to the accounts reflected on the trial balance. For the year 1979, he made two adjustments. First, he increased an account labeled "Investment in Camco" by $ 15,000 to account for money contributed directly to the project by Mr. Van Someren or his controlled entity, Air Right, and he increased "Loan Payable - Van or Air Right" in the same amount. Second, he booked a reserve for depreciation and depreciation expense for a Ford Bronco in the amount $ 2,530. After these adjustments, Mine-Rite's trial balance for 1979 reflected *190 a credit balance of $ 305,000 in an account designated "From Westates-Investor Money." For the year 1980, Mr. Lloyd made adjustments to Mine-Rite's trial balance which fall into six categories. First, he booked "Disbursements from Reno account 3-6-80 - 12-31-80" by increasing various accounts shown on the trial balance in the aggregate amount of $ 42,418.89. Second, he reduced "Investments in Camco," an asset account, and increased consultant fees to Mr. Camozzi, an expense account, in the amount of $ 16,000. Third, he increased the reserve for depreciation and depreciation expense for the Ford Bronco, in the amount of $ 2,530, and for certain office equipment, in the amount of $ 171. Fourth, he increased the note payable for the purchase of the Bronco truck by the interest to be paid over the life of the loan, $ 3,873.28, and increased prepaid interest in the same amount. Fifth, he decreased prepaid interest and increased interest expense by $ 1,549, the portion of interest paid during the year. Finally, he decreased an account labeled "From Investors" by debiting $ 120,000 to the account and made an offsetting credit to an account entitled "Westates Exchange." After these *191 adjustments were made, Mine-Rite's 1980 trial balance reflected a credit balance of $ 310,000 in the account labeled "From Investors" and a credit balance of $ 23,526.12 in the account labeled "Interest Earned." At no time prior to August or September of 1983 when Mr. Lloyd prepared the trial balances for Mine-Rite, as described above, did Mine-Rite or any person acting on its behalf prepare books or records for Mine-Rite under the completed contracts method of accounting. Prior to the time Mr. Lloyd prepared the trial balances described above, all of the entries made in Mine-Rite's books and records were based upon the amount of cash received or disbursed by the partnership. At no time did Mine-Rite or any person acting on its behalf request or receive respondent's permission to use the completed contract method of accounting. On September 29, 1986, respondent issued a statutory notice of deficiency in which he computed Mine-Rite's net income to be $ 305,135 in 1979 and $ 249,336 in 1980, using the cash method of accounting, as he had in the examination report. Based upon petitioners' 25-percent partnership interest, respondent determined that petitioners' distributive share *192 of the income from Mine-Rite amounted to $ 76,250 in 1979 and $ 62,334 in 1980. The record does not state why respondent computed petitioners' distributive share of Mine-Rite's income in 1979 to be $ 76,250, $ 34 less than 25 percent of $ 305,135. Set forth below are two schedules, the first of which compares the income and deductions claimed on Mine-Rite's 1979 return with the income and deductions determined by respondent in his notice of deficiency issued to petitioners, and the second of which is the same comparison for 1980: 1979
IRS
1980 IRS
Return
Notice Return Notice Income:
Gross Receipts     0.00 $ 105,000.00 Cost of Goods Sold     (51,000.00)
Gross Profit     0.00 54,000.00 Other Income     Interest     23,526.00
Total Income     0.00 310,000.00
77,526.00 333,750.00
Deductions:
Salaries     790.00 1,322.00
Guaranteed     Payments     26,000.00 0.00
Rent     2,500.00 2,500.00
Interest     26,600.00 26,463.00
Depreciation     2,530.00 2,530.00
2,701.00 4,537.00
Other Deductions     2,334.23 2,335.00
41,301.88 49,592.00
Total Deductions     4,864.23 4,865.00
99,892.88 84,414.00
Ordinary Income     (Loss)       (4,864.23)
305,135.00
(22,366.88)
249,336.00
Petitioners'     Share (25%)     ($ 1,216.06)
$ 76,250.00
($ 5,591.72)
$ 62,334.00
*193 The record does not explain what relationship, if any, the third partnership formed by petitioner, American Mining Trust, bore to Mine-Rite, Westates, or the subject tax shelter. In any event, on September 26, 1983, at the same time that Mine-Rite filed partnership returns for 1979 and 1980, American Mining Trust also filed Forms 1065, U.S. Partnership Return of Income, for its taxable years ending December 31, 1979, and December 31, 1980. American Mining Trust's tax returns, which are further described below, state that the partnership was engaged in the principal business activity of "milling," from which its principal product or service was "concentrate." Those returns also state that the partnership employed the cash method and reported its income on a calendar year basis. OPINION I. Mine Development Expense Deduction
Petitioners claim to be entitled to deduct $ 16,000 in 1979 as a mine development expense under section 616(a). Respondent determined that such amount is not deductible, in whole or in part, on the grounds that: (1) Petitioners have not satisfied the statutory requirements of section 616(a); (2) petitioners' investment lacked a profit objective; (3) petitioners *194 were not at risk with respect to the $ 12,000 promissory note; (4) the note did not constitute genuine indebtedness; and (5) the note was nonrecourse. We agree with respondent that petitioners have not satisfied the requirements of section 616(a) and find it unnecessary to reach the other grounds raised by respondent. Section 616(a), as in effect during 1979, provided for the current deduction of: all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures.
Generally, a mine development expense "is commonly understood by authorities in the mining field to mean the activity necessary to make a deposit accessible for mining" and is "designed to prepare the deposit for extraction or exploitation." *195 Santa Fe Pacific Railroad Co. v. United States, 378 F.2d 72, 76 (7th Cir. 1967); see Geoghegan & Mathis, Inc. v. Commissioner, 55 T.C. 672, 676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972), cert. denied 409 U.S. 842, 34 L. Ed. 2d 81, 93 S. Ct. 41 (1972). Such expenses differ from exploration expenses, which are incurred for the purpose of ascertaining the existence, location, extent, and quality of a mineral deposit, and production expenses, which are incurred to sustain extraction of the mineral. See H.G. Fenton Material Co. v. Commissioner, 74 T.C. 584, 588 (1980). To qualify for deduction, a development expense must be incurred after the disclosure of commercially marketable quantities of ore. Santa Fe Pacific Railroad Co. v. United States, supra at 75; Anderson v. Commissioner, 83 T.C. 898, 908 (1984), affd. without opinion 846 F.2d 76 (10th Cir. 1988); Saviano v. Commissioner, 80 T.C. at 960; H.G. Fenton Material Co. v. Commissioner, supra at 591; Estate of DeBie v. Commissioner, 56 T.C. 876, 893 (1971). *196 Petitioners bear the burden of proof with respect to this requirement. See Santa Fe Pacific Railroad Co. v. United States, supra at 75; Conforte v. Commissioner, 74 T.C. 1160, 1197 (1980), revd. on other ground 692 F.2d 587 (9th Cir. 1982); Rule 142(a), Tax Court Rules of Practice and Procedure.
Whether "deposits of ore * * * exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer" depends upon "consideration of all the facts and circumstances (including actions of the taxpayer)." Sec. 1.616-1(a), Income Tax Regs.; Hughes v. Commissioner, T.C. Memo 1989-528; Smith v. Commissioner, supra. Among the relevant "facts and circumstances" to be considered are the quantity, quality, accessibility, location, marketability, and current market price of a mine's ore. See, e.g., Zimmerman v. Commissioner, T.C. Memo 1987-534. The record before us contains no credible evidence, such as assay reports, geological studies, engineering reports, or market analyses, to support the commercial feasibility of the San Jeronimo mine. *197 Compare Hughes v. Commissioner, supra. In his testimony, petitioner estimated that the mine contained 5,000 tons of ore and vaguely referred to assay and engineering reports prepared by the project engineer, Mr. Camozzi. Petitioners, however, failed to produce these reports. They also failed to produce any expert testimony or other substantive information relevant to the mine's commercial value. We infer that such evidence or testimony would cast doubt on the mine's commercial feasibility. See Horn v. Commissioner, 90 T.C. 908, 936 (1988); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Based on the facts and circumstances reflected in the record, we conclude that petitioners have failed to prove that there were any minerals whatsoever located at the San Jeronimo mine, much less in commercially marketable quantities. Therefore, we sustain respondent's determination that the $ 16,000 invested by petitioners in the San Jeronimo mine through the Westates program is not deductible under section 616(a). II. Use of the Cash Method to Compute *198 Mine-Rite's Taxable Income
Respondent determined that petitioners' share of Mine-Rite's taxable income amounted to $ 76,284 in 1979 and $ 62,334 in 1980, and that their taxable income for each year should be increased accordingly. For this purpose, he computed Mine-Rite's taxable income using the cash receipts and disbursements method of accounting. Petitioners contend that the completed contract method of accounting, rather than the cash method, should be used in computing Mine-Rite's taxable income. Under the completed contract method of accounting, they contend, the partnership realized losses in each of the years at issue and they are entitled to deduct their distributive share of those losses in the amount of $ 1,216 and $ 5,592, respectively. Petitioners do not dispute that Mine-Rite received monies in the amounts determined by respondent nor do they dispute that each of the adjustments determined by respondent and the amount thereof is necessary and appropriate in computing Mine-Rite's income under the cash method of accounting. Their contention is that respondent is required to use the completed contract method of accounting because: (1) Mine-Rite maintained its financial *199 books "contemporaneously on a basis consistent with an election to use the completed contract basis of accounting"; (2) Mine-Rite adopted the completed contract method for 1979 and 1980 when it filed its first returns in 1983; and (3) the cash method does not clearly reflect the partnership's income but the completed contract method does. We disagree. Section 446(a) sets forth the general rule that a taxpayer is required to compute taxable income for Federal income tax purposes, "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." (Emphasis supplied). In this case, it is clear that Mine-Rite did not "regularly" use the completed contract method of accounting in computing its income in keeping its books. Mine-Rite recorded its cash receipts and disbursements in a cash journal and periodically posted such amounts to its general ledger. At the time it was audited for 1979, 1980, and 1981, the partnership had no books or records of any kind in which income was computed under the completed contract method of accounting. The partnership's accountant, Mr. Lloyd, acknowledged that to be the case during his testimony *200 at trial. Respondent's agent used the cash method in computing Mine-Rite's taxable income and one of Mine-Rite's partners, Mr. Philip Schouten, an accountant, signed IRS Form 4605 as a partner of Mine-Rite and represented that he "has reviewed and hereby accepts the examiner's recommended adjustments listed above resulting from an examination of returns of the entity identified above." Thereafter, respondent issued his statutory notice and determined Mine-Rite's taxable income in accordance with the examiner's report. Petitioners do not argue that Mine-Rite "regularly" used the completed contract method to compute its income for book purposes. Indeed, as discussed above, it is clear that this was not the case. Rather, petitioners argue that Mine-Rite's books and records were maintained in a manner "consistent" with the completed contract method of accounting. We are not sure what the significance of that argument may be, but it is incorrect in any event. The completed contract method of accounting is one of two accounting methods under which income from long-term contracts is included in gross income. See sec. 1.451-3(a)(1), Income Tax Regs. The other is the percentage of *201 completion method described in section 1.451-3(c), Income Tax Regs. Under the completed contract method, gross income derived from long-term contracts is reported as income for the year in which the contract is finally completed or accepted. Sec. 1.451-3(d), Income Tax Regs. Under this method, the gross contract price of each long-term contract is included in gross income for the taxable year in which the contract is completed, and all costs properly allocable to the contract must be deducted from gross income in the same year. Sec. 1.451-3(d)(1), Income Tax Regs.; see generally Sierracin Corp. v. Commissioner, 90 T.C. 341 (1988); Rotolo v. Commissioner, 88 T.C. 1500 (1987); Guy F. Atkinson Co. v. Commissioner, 82 T.C. 275 (1984), affd. 814 F.2d 1388 (9th Cir. 1987). Petitioners claim that Mine-Rite's general ledger accounts for "Advances to Camco Industrias" and "Advances to M.B. Mining Co." are the costs allocable to long-term contracts, so-called product costs. They claim that other expense accounts in Mine-Rite's general ledger, "professional services," "interest expense," "road and travel," etc., *202 are costs not allocable to long-term contracts, so-called period costs. Petitioners point to the existence of these accounts as evidence that Mine-Rite's books and records "were maintained on a basis wholly consistent with the completed contract basis of accounting." However, the general ledger accounts for "Advances to Camco Industrias" and "Advances to M.B. Mining Co." contain Mine-Rite's payments to two of the three joint ventures which are described above. Petitioners did not introduce the joint venture agreements into evidence, but the payments are described as "capital" in the trial balances for each of the joint ventures. Thus, it appears that these accounts record Mine-Rite's payments of capital to specific joint ventures and do not record long-term contract costs. Moreover, the long-term contracts for which petitioners claim Mine-Rite was accounting are the individual "mining contracts" which Mine-Rite entered into with investors. There is no evidence in the record that Mine-Rite allocated costs between or among those "mining contracts." There is also no indication in the Mine-Rite books and records that those contracts were aggregated according to the mine at which *203 the development work was to be done. Even if such aggregation were permissible, which is not clear, see sec. 1.451-3(e)(1), Income Tax Regs., petitioners do not cite any authority to aggregate costs according to the three joint ventures, rather than according to the four mines. We also find unpersuasive petitioners' argument that, as a matter of law, Mine-Rite can properly use the completed contract method because the partnership "adopted" that method on its "first returns," filed September 26, 1983, for the taxable years ending December 31, 1979, and December 31, 1980. Although section 1.446-1(e)(1), Income Tax Regs., provides that "A taxpayer filing his first return may adopt any permissible method of accounting in computing taxable income for the taxable year covered by such return," the method so adopted must still conform to taxpayer's book method of accounting. To conclude otherwise would obviate the requirement under section 446(a) that a taxpayer's tax accounting method conform to its "regularly" used book accounting method. Moreover, a taxpayer's notation of its accounting method on a return is not determinative of its actual accounting method. Aluminum Castings Co. v. Routzahn, 282 U.S. 92, 99, 75 L. Ed. 234, 51 S. Ct. 11 (1930); *204 Lincoln Storage Warehouses v. Commissioner, 13 T.C. 33, 41 (1949), affd. 189 F.2d 337 (3d Cir. 1950). Respondent argues that Mine-Rite used the cash method to "regularly" compute its income in keeping its books and is, accordingly, required under section 446(a) to use the cash method in determining its taxable income for 1979 and 1980. Respondent's argument has merit. See, e.g., Mifflin v. Commissioner, 24 T.C. 973, 979 (1955); Tunningley v. Commissioner, 22 T.C. 1108, 1117-1118 (1954). However, based upon the facts in this case, we cannot find that Mine-Rite "regularly" computed its income using the cash method of accounting. While Mine-Rite booked its cash receipts and disbursements and periodically entered those amounts into its general ledger, there is no evidence in the record that it computed its income for book purposes prior to 1983. Since there is no evidence in this case that Mine-Rite "regularly" computed its income using the completed contract method of accounting or any other method of accounting, our decision must be governed by the exception to the general rule contained in section 446(b) *205 which provides: If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.
Section 446(b) vests respondent with "wide discretion" in selecting an accounting method which clearly reflects a taxpayer's income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 533, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979); see United States v. Catto, 384 U.S. 102, 114, 16 L. Ed. 2d 398, 86 S. Ct. 1311 (1966); Commissioner v. Hansen, 360 U.S. 446, 467, 3 L. Ed. 2d 1360, 79 S. Ct. 1270 (1959); Lucas v. American Code Co., 280 U.S. 445, 449, 74 L. Ed. 538, 50 S. Ct. 202 (1930); Molsen v. Commissioner, 85 T.C. 485, 498 (1985). Respondent's determination under section 446(b) will be upheld absent an abuse of discretion, and petitioners bear a "heavy burden" of proof to show that such determination is "clearly unlawful" or "plainly arbitrary." Thor Power Tool Co. v. Commissioner, supra at 532-533. In this case, petitioners must prove that respondent abused his discretion in determining that the cash method clearly *206 reflects Mine-Rite's income. See, e.g., Capitol Federal Savings & Loan Association v. Commissioner, 96 T.C. 204 (slip op. at 8-9) (1991); Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989). As we noted earlier, petitioners argue that Mine-Rite was eligible to adopt the completed contract method of accounting and that such method of accounting clearly reflects Mine-Rite's income. We do not reach these issues, because petitioners have failed to prove that respondent abused his discretion under section 446(b) in using the cash method to compute Mine-Rite's income. At the outset, we note that petitioners misperceive the burden of proof in this case. They apparently believe that respondent has the burden of proving that the cash method clearly reflects income. They argue as follows: The Respondent has not introduced any evidence, adduced any testimony or otherwise even in so many words asserted that the cash basis of accounting clearly reflects the income of Mine-Rite for the years before the Court.
They further argue: Respondent's argument is limited to the proposition that merely saying it is *207 so, makes it so. Whatever presumption existed in Respondent's favor vanished entirely in the face of the contrary evidence in the record. Respondent offered nothing in opposition to the evidence in the record.
As discussed above, however, petitioners not only bear the burden of proof, they bear a heavy burden of proof. Thor Power Tool Co. v. Commissioner, 439 U.S. at 532-533; Capitol Federal Savings & Loan Ass'n v. Commissioner, supra; Prabel v. Commissioner, supra.
In support of their contention that the cash method does not clearly reflect income, petitioners first allege that respondent used the cash method to compute Mine-Rite's income as a "punitive device." Petitioners argue that respondent's agents misperceived the nature of the promotion in this case and equated it with "the infamous program called 'Gold for Tax Dollars'" and that respondent's agents also misperceived the nature of petitioner's activities on behalf of the subject program. In effect, petitioners contend that respondent's agents computed Mine-Rite's income in an effort to punish petitioners. To the contrary, we find no evidence that the adjustments *208 proposed against petitioners were intended to be punitive. In fact, they are well supported. Petitioners' second argument suggests that the cash method mismatches income and expenses. They state as follows: The cash method is totally inappropriate in this situation. By isolating receipt of money from the expenditure thereof a gross distortion of income results.
They further state as follows: An examination of [Mine-Rite's 1970 and 1980 Federal income tax returns] discloses that Mine-Rite expended during 1979 and 1980 in excess of $ 700,000.00 of "product costs" and almost $ 100,000.00 of "period costs." This $ 800,000.00 is substantially in excess of the $ 644,000.00 of gross income Respondent asserts it received. Clearly, Mine-Rite received no net income in the economic sense in those years. A finding that Petitioner realized taxable income from Mine-Rite in excess of $ 138,000.00 during those years would indeed be a draconian result. It was just to avoid that draconian result that the completed contract basis of accounting was inserted in the regulations.
The "$ 700,000.00 of 'product costs'" referred to above are actually the "advances" which Mine-Rite made *209 to the joint ventures discussed above. Petitioners chose not to introduce the joint venture agreements into evidence. Those agreements govern Mine-Rite's payment of such advances and its share of any profits realized by the joint ventures. Significantly, as discussed above, the trial balances prepared for the joint ventures label such amounts "Capital." Under these circumstances, we are unwilling to accept petitioners' argument premised on the theory that such amounts are "product costs." Petitioners failed to prove any distortion of income or mismatching of income and expenses. Moreover, it appears that respondent's computation of Mine-Rite's income is fully consistent with the trial balances prepared by Mr. Lloyd for Mine-Rite. The 1979 trial balance shows a credit balance of $ 305,000 in an account designated "From Westates Dev -- Investor money." The total income determined by respondent for 1979 is $ 305,135. Similarly, the 1980 trial balance shows a credit balance of $ 310,000 in an account labeled "From Investors." There is also a credit balance of $ 23,526.12 in an account labeled "Interest Earned." The total of those two accounts, $ 333,526, is similar to the total *210 income determined by respondent in the amount of $ 333,750. On the other hand, Mine Rite's 1980 return reports gross receipts of $ 105,000. We find nothing in Mine-Rite's trial balance for 1980 which explains how this amount was computed. Additionally, petitioners have offered no evidence to substantiate any deductions other than those allowed by respondent. Indeed, petitioners have not even attempted to reconcile the deductions claimed with those allowed by respondent. In our view, respondent's determination is in full accord with proper tax accounting principles, and petitioners have shown no authority in law or in fact to support their position. We cannot characterize respondent's actions as "plainly arbitrary," or conclude that there is no adequate basis in law for his determination. Accordingly, we hold that petitioners must report their income from Mine-Rite in conformity with the cash method. III. American Mining Trust Losses
Petitioners contend that they are entitled to losses of $ 601 in 1979 and $ 34,410 in 1980, as their distributive share of the partnership's profits and losses for those years. Respondent contends that petitioners have not substantiated these *211 losses. We agree with respondent. Petitioners bear the burden of proof with respect to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners introduced the following evidence to substantiate their claim: (1) Forms 1065, U.S. Partnership Return of Income, filed September 26, 1983, alleging that American Mining Trust incurred losses of $ 1,804.00 and $ 103,231.00 for the partnership's respective taxable years ending December 31, 1979, and December 31, 1980; and (2) Schedules K-1, Partner's Share of Income Deductions, Credits, etc., stating that distributive shares of the partnership's losses for those years were $ 804 and $ 34,410, respectively. Petitioners argue that "a review of the tax returns [filed on behalf of American Mining Trust] shows that as a general partner, without limitation, Petitioner was jointly and severely liable on the debts of American Mining Trust." Petitioners further argue that "Respondent solicited no testimony or evidence to show that the debts were limited in any fashion and as such, Petitioners should be entitled to an 'at risk' basis sufficient to allow them their distributive share of the 1980 loss of American Mining Trust." *212 A tax return, however, is merely a statement of a taxpayer's claim, and does not establish the correctness of the figures and facts stated therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957). Indeed, to hold that representations on a return constitute proof of a taxpayer's entitlement to those items would negate the presumption of correctness attached to respondent's statutory notice of deficiency. Halle v. Commissioner, 7 T.C. 245, 247-248 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Because the record is devoid of any other evidence to substantiate the amounts asserted on the partnership's returns, petitioners have failed to carry their burden of proof on this issue. Accordingly, we hold that they are not entitled to deduct any losses from American Mining Trust in 1979 or 1980. To reflect the foregoing, Decision will be entered under Rule 155.